IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DONALD SIMMONS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:04CV783-F |
| | ) | [WO] |
| STATE OF ALABAMA DEPARTMENT | ) | |
| OF CORRECTIONS, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This matter is before the court on the defendant's ["ADOC"] Motion for Summary Judgment (Doc. # 22) of the plaintiff's ["Simmons"] claims of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ["Title VII"], 42 U.S.C. §§ 2000e *et seq.*[1] ADOC's motion was supported with a legal memorandum (Doc.

---

[1] Simmons's complaint cites also to 42 U.S.C. § 1981, which prohibits race discrimination but is not applicable to actions against State actors. Discrimination claims against state actors may be addressed via 42 U.S.C. § 1983, but Simmons has not invoked or otherwise relied upon that statute. *See* **Butts v. County of Volusia**, 222 F.3d 891 (11th Cir. 2000) (upholding summary judgment of a section 1981 claim that did not invoke section 1983). Simmons's failure to invoke section 1983 may or may not be dispositive of whether his section 1981 claim should survive, an issue that neither party has raised. *Contrast* **Butts**, 222 F.3d at 894-5 ("The district court therefore correctly concluded Appellant could not proceed with his cause of action based solely on § 1981") *with* **Webster v. Fulton County, Ga.**, 283 F.3d 1254 (11th Cir. 2002) (discussing a claim for retaliation under section 1981 and implicitly suggesting that a claim under section 1981 need not expressly invoke section 1983). Regardless, the court finds that Simmons has not brought a section 1981 claim. Simmons did not rely on either section 1981 or 1983 when opposing the former individual defendant's (Donal Campbell ["Campbell"], the Commissioner of ADOC) motion to dismiss Simmons's claims against him, which the court granted (Docs. # 5, 7, 8). Moreover, Simmons failed to allege that "the discrimination complained of [was] a custom or policy of the governmental entity" as is required under sections 1981 and 1983. **Webster**, 283 F.3d at 1257, n.8 (citing **Monell v. Dep't of Soc. Svcs. of New York**, 436 U.S. 658, 694-95 (1978)). Therefore, this case concerns Title VII claims only.

# 23) accompanied by evidentiary exhibits. Simmons responded with a memorandum and affidavit (Doc. # 29). Having reviewed the parties' submissions and the relevant law, the Magistrate Judge recommends that the motion be granted in part and denied in part.

## I.   INTRODUCTION

This case requires the court to review the circumstances surrounding two alleged incidents that took place several months apart. Simmons, who is white, alleges that ADOC twice precluded him from working overtime for extended periods of time while allowing similarly situated African-American employees to continue working overtime. Although the incidents are not entirely dissimilar, a separate analysis of the facts, arguments, and legal merits concerning each incident will better facilitate clarity and understanding. Therefore, the court first discusses the summary judgment standard and the general law applicable to all of Simmons's claims before moving on to the specific circumstances central to this case.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Green v. Pittsburgh Plate & Glass Co.*, 224 F. Supp. 2d 1348, 1352 (N.D. Ala. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A judge's guide is the same standard necessary to

direct a verdict: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id*. at 259. "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party.[2] ***Adickes v. S.H. Kress & Co.***, 398 U.S. 144, 158 (1970); ***Mize v. Jefferson City Bd. of Educ.***, 93 F.3d 739, 742 (11th Cir. 1996). Notwithstanding this advantage, a nonmoving plaintiff bears the burden of coming forth with sufficient evidence on each element that must be proved.[3]

---

[2] The Supreme Court explained that:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

***Celotex Corp. v. Catrett***, 477 U.S. 317, 322-23 (1986) (citations omitted).

[3] In a Title VII claim based on circumstantial evidence, "if on any part of the prima facie case there would be insufficient evidence to require submission of the case to a jury, . . . [the court must] grant summary judgment [for the defendant]." ***Earley***, 907 F.2d at 1080 (citations omitted). In ***Earley***, the Court of Appeals further emphasized:

> "The mere existence of a scintilla of evidence in support of the

3

*Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990); *see Celotex*, 477 U.S. at 322-23.  When faced with a properly supported motion for summary judgment, a plaintiff must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324.  Although the evidence need not be in a form necessary for admission at trial, *id.*, unsupported, self-serving allegations are insufficient to oppose a motion for summary judgment. *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995); *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984).

### III.   ANALYSIS

*A.   Disparate Treatment and Retaliation in General*

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1) (2000).  Furthermore, employers are prohibited from discriminating against persons who have "opposed any practice made an unlawful employment practice . . ., or because [they have] made a charge, testified, assisted,

---

plaintiff's position will be insufficient;  there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

***

["]If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted) (emphasis added); *accord Hudson v. Southern Ductile Casting Corp.*, 849 F.2d 1372, 1376 (11th Cir. 1988).

*Earley*, 907 F.2d at 1080-81.

4

or participated in any manner in an investigation, proceeding or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).

Ultimately, Simmons must point to evidence that, if believed, would allow a reasonable trier of fact to conclude that ADOC treated him differently because he is white and/or because he engaged in activity protected by Title VII. He may do so through the introduction of direct, circumstantial and/or statistical evidence. *See*, *e.g.*, **Wilson v. B/E Aerospace, Inc.**, 376 F.3d 1079, 1085 (11th Cir. 2004); **Corbin v. Southland Int'l Trucks**, 25 F.3d 1545, 1548 (11th Cir. 1994).

Simmons points to no direct or statistical evidence supporting his claims, thus his case must be analyzed according to the familiar burden-shifting framework set forth in **McDonnell Douglas Corp. v. Green**, 411 U.S. 792 (1973). Consequently, to survive summary judgment, he must first present a *prima facie* case, which generally means that, for purposes of his disparate treatment claim, he must demonstrate that he was a qualified member of a protected class and was treated differently than similarly situated persons outside his protected class. **Wilson**, 376 F.3d at 1087. In proving his retaliation claim, he must demonstrate that he was subjected to an adverse employment action as the result of engaging in protected activity. *See generally* **Johnson v. Booker T. Washington Broad. Svc., Inc.**, 234 F.3d 501, 507 (11th Cir. 2000).

Assuming he is successful, the burden shifts to ADOC to "articulate a legitimate, nondiscriminatory" or nonretaliatory reason for its alleged actions. **Wilson**, 376 F.3d at 1087.; *see also* **Walker v. Elmore County Bd. of Educ.**, 379 F.3d 1249, 1252 (11th Cir.

5

2004) (summarizing the burden-shifting framework as applied to a claim of retaliation).

If ADOC succeeds, the burden shifts back to Simmons

> to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination [or retaliation]. [*Tex. Dep't of Comty. Affairs v.*] *Burdine*, 450 U.S. [248,] 255-56 [(1981)].
>
> If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. *Chapman*, 229 F.3d at 1030. Quarreling with that reason is not sufficient. *See id.* The evidence may include, however, the same evidence offered initially to establish the prima facie case. *Combs* [*v. Plantation Patterns*], 106 F.3d [1519,] 1528 [(11th Cir. 1997)].
>
> Despite the shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

*Wilson*, 376 F.3d at 1087-88.

**B.    *The 2003 Incident***

   **1.    Facts**

Viewing the evidence in the light most favorable to Simmons, drawing all reasonable inferences in his favor, and accepting as true his sworn assertions, the relevant facts of this case begin with events taking place in the early part of 2003, when Simmons, who was at the time a Corrections Officer I employed by ADOC, was struggling with a medical condition commonly referred to as "hammer toe" (Def's Ex. 3, Gibson Aff., attch. 1; Doc. # 29-1, p. 2). *See* Medline Plus, *Encyclopedia*, http://www.nlm.nih.gov/medlineplus/ency/article/

001235.htm (explaining the condition).

On 24 February 2003, Simmons obtained from his doctor a note requesting that he "limit his walking and standing," which Simmons then submitted to a supervisor, Nathaniel Lawson ["Lawson"], who was responsible for assigning officers to their particular shift duties (Doc. # 23-1, p. 3; Doc. # 29-1, p. 7; Def's Ex. 6, pp. 1-2; Def's Ex. 7, p. 2).[4]

On 17 March 2003, two days before Simmons was scheduled to undergo corrective foot surgery, Lamar Gibson, who was then Simmons's shift commander, "requested, through Warden Gwendolyn Mosley ["Mosley"], that Officer Simmons not be allowed to work overtime until his health improved and he returned to normal duty status" (Def's Ex. 3, p. 3).

On the following day, Simmons submitted to Lawson another doctor's note requesting that he be assigned to one of three specific posts for the day (Def's Ex. 6, p. 2, attch. 1).[5] By

---

[4] Shift duties at the prison include vehicular perimeter patrol, "rover positions within the facility, . . . visitation lobby post, and visitation yard assignment and assignments to cubicles #5, #6, #7, #8 and #9 and [sic] #10" (Doc. # 23-1, p. 3; Def's Ex. 3, p. 2).

[5] Simmons does not specifically concede this point, and his brief states that "prior to his surgery, . . . [he] did not ask for any particular assignment or change in duties in any way" (Doc. # 29-1, p. 2). In support of this contention, Simmons cites to two pages of his deposition that have not been submitted as part of the record and cannot, therefore, be considered by the court. Simmons also cites to his affidavit, which states in relevant part:

> 2. When I was allowed to work overtime, I never complained to my supervisors that I was unable to perform my duties on my assigned shift, first.
> 3. I never indicated to my supervisors that my feet hurt and never requested to be allowed to go home instead of working my post because of my feet.
> \*\*\*
> 6. Even though when I returned to work *before* my mallot [sic] toe surgery my doctor placed me on light duty, I was not given light duty on first shift.

7

the time Lawson received the request, however, Simmons's shift was nearly over. *Id.*

From 19 March through 16 April, Simmons was on medical leave (Def's Ex. 2, p. 2). He returned to work on 17 April with a note from his doctor restricting him to "light duty - limited walking & desk duty for 10 days" and stating, in addition, that he could "[r]eturn to full duty on April 28th, 2003, provided sandals may be worn x 4 wks. OK for pt. to drive" (Def's Ex. 2, attch. 6). Simmons did not begin working overtime again until Thursday, 12 June (Def's Ex. 8, attch. 1).

### 2. Legal Merits

#### a. *Prima Facie case*

Simmons contends that by precluding him from working overtime, ADOC treated him differently than African-American officers Guerry Bonner ["Bonner"] and Phelix Woods ["Woods"], both of whom were permitted to work overtime while under doctor-imposed medical restrictions (Doc. # 23-1, pp. 15-19; Doc. # 29-1, p. 7; Def's Ex. 4, p. 2; Def's Ex. 5, pp. 2-3). Conceding that Simmons has satisfied all other elements of a *prima facie* case of discrimination, including the fact that he was treated differently than Bonner and Woods, ADOC contends nonetheless that Simmons was not similarly situated to Bonner or Woods

---

(Pl's Ex. 1) (emphasis added). Thus, his affidavit not only fails to address the issue directly, but it also concedes awareness by his employer of his doctor's requested limitations. While this does not mean necessarily that he submitted a note to Lawson on 18 March, it does, along with his failure to address the point specifically, leave no other inference to be drawn.

8

because Bonner and Woods performed their duties differently while on light duty status.

According to the memo Gibson sent to Mosley on 17 March, his request to preclude Simmons from working overtime was based on his observation that, apparently contrary to Woods and Bonner, while working overtime, "Simmons has complained to me lately of his post assignments and daily requests to be assigned where walking is limited, such as the tower, perimeter vehicles and Segregation Cubicle" (Def's Ex. 2, attch. 7).

As Gibson's affidavit states, "[A] pattern developed wherein Officer Simmons would work overtime on Third Shift and then report to First Shift, which was his permanent assignment, and indicate that he was unable to perform the duty post assigned to him and request another post assignment" (Def's Ex. 3, p. 2). Furthermore, "he would indicate that his feet hurt and request that he be allowed to go home instead of working his post." *Id.* at 3. Thus, apparently, Mosley granted Gibson's request because Simmons "was unable to perform his regular duties after working overtime" (Def's Ex. 2, p. 3).

Simmons contends, however, that this distinction is false because he "never complained . . . that [he] was unable to perform [his] duties on [his] assigned shift" and "never indicated to [his] supervisors that [his] feet hurt and never requested to be allowed to go home instead of working [his] post because of [his] feet" (Pl's Ex. 1, ¶¶ 2-3).[6] Simmons's

---

[6] ADOC has excised portions of Simmons's deposition that arguably support their contention that he complained and conceivably could be construed as conflicting with his affidavit (Doc. # 23-1, pp. 17-18; Def's Ex. 1, pp. 6-7). These carefully selected excerpts, however, lack context and factual references that would allow the court to determine whether the excerpts mean what ADOC contends they mean. In light of the uncertainty, the court must conclude that they do not support ADOC or conflict with Simmons's affidavit. Simmons's letter to the EEOC, which ADOC also provides as an exhibit, suffers similarly, though its flaw is

sworn statement directly contradicting ADOC's evidence in support of its contention (i.e., Gibson's sworn statement) that Simmons was not similarly situated to Bonner and Woods is sufficient to create a factual dispute regarding whether Simmons behaved the way Gibson said he behaved. Notably, Lawson, who was responsible for shift assignments, does not corroborate Gibson's statements (Def's Ex. 6).

Viewing the evidence in Simmons's favor, the court must conclude that Simmons did not complain or request to go home. Therefore, he is similarly situated in all relevant aspects to at least Woods, who was assigned to the same shift as Simmons during a period of doctor-ordered light duty and was subject to being assigned in the same positions as Simmons (Def's Ex. 5).

Furthermore, Woods's light duty status was premised on similar restrictions that arguably were more limiting than Simmons's (Doc. # 23–1, p. 16).[7] *See*, *e.g.*, **Silvera v. Orange County Sch. Bd.**, 244 F.3d 1253, 1259 (11th Cir. 2001) (holding that "similar offenses" must be nearly identical and stating, "In order to meet the comparability requirement a plaintiff is required to show that he is similarly situated in all relevant aspects to the non-minority employee."). Therefore, Simmons has stated a *prima facie* case with respect to his 2003 claim.

---

ambiguity rather than incompleteness (Def's Ex. 7). Again, the uncertainty compels the court to construe the ambiguity in Simmons's favor for summary judgment purposes.

[7] Woods was restricted to "limited walking, and no prolonged standing" (Doc. # 23-1, p. 16), whereas Simmons's doctor's note of 24 February, which was the only medical limitation in ADOC's possession when Gibson made his recommendation to Mosley, requested that Simmons "limit his walking & standing" (Def's Ex. 3, attch. 1).

      *b.*      *ADOC's Reason and Pretext*

ADOC's legitimate, nondiscriminatory reason mirrors the distinctions proffered in support of its contention that Simmons was not similarly situated to Bonner and Woods. Thus, Simmons's sworn disagreement with the crucial facts regarding his own behavior also serves to raise a genuine dispute regarding whether ADOC's reason is pretext.

Simmons's testimony is not the only evidence of pretext, however, and the inconsistencies, ambiguities and lapses in logic that pervade ADOC's evidentiary submissions create a substantial credibility issue that this court may not decide on summary judgment. *See, e.g.*, **Cleveland v. Home Shopping Network**, 369 F.3d 1189, 1193 (11th Cir. 2004) (reversing "the district court's judgment as a matter of law because Cleveland produced sufficient evidence for the jury to find the [defendant's] . . . excuse was pretextual"); **Ashe v. Aronov Homes, Inc.**, 354 F. Supp. 2d 1251, 1260 (M.D. Ala. 2004) (stating that "[a]t the pretext stage, in order to survive summary judgment" the plaintiff must demonstrate either "that the employer's legitimate nondiscriminatory reasons should not be believed; or . . . that, in light of all of the evidence, a discriminatory reason more likely motivated the decision").[8]

---

[8]Examples of ADOC's evidentiary flaws include the following:

1.    In his memo to Mosley requesting the overtime bar, Gibson stated that "Simmons is presently on *light duty status upon request of his doctor*." Later in that same memo, Gibson noted that he was attaching "two (2) medical written expressions, *neither directing light duty status*." In his affidavit, however, when describing Simmons's alleged complaints, which led to the writing of the memo, Gibson

11

C.     *The 2004 Incident*

>    stated, "Notably, at this time, Officer Simmons had not presented me with a doctor's profile indicating that he could only work [specified] . . . posts within the institution." At the very least, Gibson's statements are ambiguous. Arguably, they are contradictory (Def's Ex. 2, attch. 7).

2.    Focusing on the same memorandum, one of the reasons Gibson provided in support of his request was Simmons's request to be assigned to posts "where walking is limited," which echoes the limitation imposed by the doctor in the note dated 24 February, which was arguably in Gibson's possession (Def's Ex. 2, attch. 7; Def's Ex. 3, attch. 1). In other words, Gibson's memorandum essentially admits that Simmons was being barred from overtime due, at least in part, to the medical limitation itself. Considered together with his statement that Simmons was complaining about the other posts to which he had been assigned, one may also conclude that ADOC was ignoring the medical limitations. Finally, Gibson's rationale is not logical. The limitations on the quality or character of Simmons's activities is not dispositive of his ability to perform those limited activities for more than eight hours a day.

3.    According to Gibson's memorandum, the overtime bar was intended to last only "until [Simmons's] work status returns to normal duty" (Def's Ex. 2, attch. 7). Thus, the lifting of the bar seems to have been tied to the lifting of Simmons's physical limitations, as opposed to his work attitude or ability to work overtime without compromising his ability to complete his assigned shift. Furthermore, and perhaps more importantly, despite this apparent limitation, Simmons was not permitted to work overtime for more than a month after the doctor allowed him to return to full duty if allowed to wear sandals (Def's Ex. 2, attch. 7; Def's Ex. 8, attch. 1).

4.    In addition to treating him differently with respect to overtime, the evidence arguably supports the conclusion that he was being treated differently with respect to ADOC's willingness to accommodate his limitations. Simmons's affidavit states that he was not assigned to light duty positions despite his doctor's limitations (Pl's Ex. 1, ¶ 6). Affidavits from Bonner and Woods, however, indicate that ADOC accommodated their limitations. Bonner stated that while assigned to Simmons's shift while on light duty status, he was assigned only to the vehicle perimeter patrol position (Def's Ex. 4, p. 2). Although Woods stated that toward the end of his five-month light duty status he performed several positions, he did not indicate which positions he performed during the first three months of his light duty status (Def's Ex. 5). Moreover, Woods stated that he was able to work all positions except for the rover, tower, visitation lobby and visitation yard, and he was not required to work any of these during his light duty status. *Id.*

**1.     Facts**

For reasons that ADOC does not offer to the court, Gibson was transferred to a different shift in November 2003, shortly after Simmons filed his first EEOC charge (Def's Ex. 3, p. 1). During the following February, Simmons was accused of sleeping while on duty, and approximately two weeks later, his shift supervisors, Jeffrey Knox ["Knox"] and Dexter Brown ["Brown"], recommended to Mosley that she issue Simmons a written reprimand (Def's Ex. 2, p. 4).

Toward the end of March, approximately one month after the incident, Mosley forwarded the recommendation to ADOC's personnel director, who returned it with a note from ADOC's deputy commissioner of operations, Greg Lovelace ["Lovelace"], instructing Mosley to resubmit the paperwork with a recommendation for a five-day suspension (Def's Ex. 2, p. 4).

Mosley complied with Lovelace's instructions and on 8 April 2004 notified Simmons of the new recommendation (Def's Ex. 2, attch. 10). On 20 April, Simmons's immediate supervisor, Willie Bryant ["Bryant"], notified Simmons that while the recommendation was pending during the administrative review process, he would not be permitted to work overtime (Def's Ex. 2, attch. 11). Mosley issued a memorandum approximately one week later clarifying that, while Simmons would not be permitted to work voluntary overtime, he may be required to work overtime as the need arose (Def's Ex. 2, attch. 12). According to Mosley, it was her institution's longstanding policy "that an employee who is recommended for suspension, because of a post related violation, . . . be barred from earning voluntary

overtime" (Def's Ex. 2, p. 5).

On 5 May, Simmons was found not guilty of the charges, and Mosley forwarded the "hearing minutes" to ADOC's commissioner, Campbell, for final action (Def's Ex. 2, p. 5). She did not lift the overtime restriction and told Simmons the restriction would continue until Campell issued a final decision (Def's Ex. 2, p. 5 and attch. 13). Simmons then complained to Campbell, who on 6 July issued an agency-wide memorandum notifying all wardens, *inter alia*, that they must first obtain approval from Lovelace before prohibiting any employees from working overtime. (Doc. # 29-1, p. 7; Def's Ex. 2, attch. 14). In response, on 7 July, Mosley issued a memorandum lifting all overtime restrictions (Def's Ex. 2, attch. 15).

2.   **Legal Merits**

Simmons contends that the second overtime bar was both discriminatory and retaliatory. ADOC contends that Simmons has failed to state a *prima facie* case under either theory, and Simmons responds with a somewhat incoherent, two-paragraph argument that, although less than clear, appears simultaneously to achieve three puzzling objectives:

1.   He limits both the discrimination and retaliation claims to the time period following the not guilty finding while awaiting a final decision from Campbell.[9]

2.   In addition, he expands his retaliation claim to include the accusation that he

---

[9]Thus, Simmons belies any assertion that Mosley's reason for barring him from overtime while his suspension was under review was pretext.

>   was sleeping in an apparent attempt to close the temporal gap between the second overtime bar and his first EEOC complaint, which he filed on 11 September 2003 (Doc. # 29-1, p. 2).
>
> 3. Finally, he virtually eliminates his retaliation claim by admitting that "there was *no justification other than race* for barring him" from working overtime (Doc. # 29-1, pp. 7-8).

Assuming *arguendo* that he has established a *prima facie* case of either discrimination or retaliation, Simmons certainly has failed to point to any evidence that would allow a trier of fact to conclude that Bryant or Mosley were not, or did not believe they were, following appropriate institutional policy when they imposed the second overtime bar and continued the bar until directed by Campbell to lift the restriction.[10] The fact that the policy, which Simmons does not contend was discriminatory either facially or as applied, or Mosley's actions in implementing the policy may have been incorrect or improper is immaterial. *See Silvera*, 244 F.3d at 1261 ("[A]n employer who treats two employees differently because of a mistaken belief in the existence of a neutral reason does not violate Title VII" (citing ***Wolf v. Buss (America) Inc.***, 77 F.3d 914, 919 (7th Cir. 1996) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action."); ***Lee v. GTE Fla., Inc.***, 226 F.3d 1249, 1253 (11th Cir. 2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were

---

[10]Contrary to Simmons's apparent belief, Mosley's sworn statement that her institution maintained such a policy is sufficient to require him to point to evidence that it did not.

in fact motivated by [race].").[11]

Simmons has therefore failed to point to evidence that ADOC's stated reason for barring him from overtime a second time was pretext for either discrimination or retaliation. Consequently, no genuine dispute of material fact exists, and ADOC is entitled to judgment as a matter of law. Summary judgment should therefore be granted in favor of the defendant on Simmons's claims for disparate treatment and retaliation in connection with the 2004 incident.

## IV. CONCLUSION

Therefore, it is the RECOMMENDATION of the Magistrate Judge that ADOC's motion be DENIED with respect to Simmon's complaint that he was discriminated against in violation of Title VII when ADOC barred him from working overtime in 2003. The Magistrate Judge further RECOMMENDS that ADOC's motion be GRANTED in all other respects. It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before 18 January, 2005. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not

---

[11]Importantly, Simmons does not challenge ADOC's contention that he failed to point to a similarly situated person not of his race who was treated differently (Doc. # 23-1, pp. 20-22).

appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. ***Nettles v. Wainwright***, 677 F.2d 404 (5th Cir. 1982). *See **Stein v. Reynolds Securities, Inc.***, 667 F.2d 33 (11th Cir. 1982). *See also **Bonner v. City of Prichard***, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on 30 September 1981).

DONE this 4th day of January, 2006.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE